**SECOND DIVISION
MILLER, P. J.,
HODGES and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**September 28, 2021**

# In the Court of Appeals of Georgia

A21A0803. WOODS v. THE STATE.

HODGES, Judge.

Following a jury trial, the Superior Court of Evans County entered a judgment of conviction against Mashoko Woods for one count of neglect of a disabled person (OCGA § 30-5-8 (a) (2010)).[1] Woods appeals from the denial of his motion for new trial as amended, arguing that: (1) OCGA § 30-5-8 (a) (1) (2010) is void for vagueness because it fails to give fair warning that specific conduct is forbidden, thereby violating his due process rights; (2) he received ineffective assistance of trial counsel resulting from counsel's failure to file a void-for-vagueness due process

---

[1] Woods was indicted in February 2011 for acts that occurred in February 2010. The jury found Woods not guilty of a second count of neglect of a disabled person, and the trial court directed a verdict of acquittal on an additional count of abuse of a disabled person.

challenge to OCGA § 30-5-8 or to object to the trial court's sua sponte jury instruction defining "caretaker"; and (3) the evidence was insufficient. For the following reasons, we affirm.

Viewed in a light most favorable to the verdict,[2] the evidence adduced at trial revealed that the victim, who was born on January 11, 1955, originally lived in Queens, New York. When she was two-and-a-half years old, she contracted encephalitis from a mosquito bite, which left her permanently mentally disabled.[3] The victim lived with her family until she was 28 year old; at that time, the victim's family applied for a home for the victim through a New York social services agency, as her parents were "concerned about aging" and wanted "to make plans for [the victim] to have a good life." The agency located a home for the victim with Zenobia Woods ("Zenobia") approximately 10 miles away. For the next 10 years, the victim's family was able to visit the victim frequently, and the victim's family and Zenobia's family became close.

---

[2] See, e.g., *Laster v. State*, 311 Ga. App. 360 (1) (715 SE2d 768) (2011).

[3] Although the victim would eventually be able to walk, ride a tricycle, partially dress herself, feed herself, and toilet herself, her mental acuity remained the same as a two to two-and-a-half year old child.

In 1993, with her mother in failing health in Claxton, Georgia, Zenobia approached the victim's father and asked if she could bring the victim with her to Georgia. The victim's father agreed, and Zenobia and the victim moved to Claxton. For the next several years, Zenobia continued to care for the victim.

In December 2009, Zenobia suffered a brain aneurysm. At that time, Woods — Zenobia's son — then came to Georgia from Maryland to assist his mother with her care.

The victim's sister, Susan Wilson, arrived at Zenobia's residence for a visit on February 1, 2010. Although the victim was seated at a table and Wilson could not get a good look at her initially, Wilson was concerned about the victim's appearance and began questioning Zenobia and Woods, asking whether the victim had seen a doctor or was taking any medications. When Wilson asked who had been taking care of the victim during Zenobia's recent hospitalization, Woods "said he took care of [the victim]." As the visit progressed, Wilson's concerns intensified, particularly when she "started seeing how emaciated she was" and noticed that her "wrist appeared to be broken" and had "huge knots on her head." The victim nodded off while at the table, and Wilson repeatedly requested that she go to bed. Woods carried the victim to bed, and it was then that Wilson noticed the victim's bed was on the floor and that her

room, which was locked from the outside, did not have lighting, a radio, or a television. Wilson also noticed that the victim was wearing diapers, which was unusual since the victim had always been able to address her own toileting needs.

The next day, Wilson telephoned emergency medical technicians and the Evans County sheriff to request that the victim be transported to the hospital for an examination. EMTs arrived at Zenobia's residence, but aside from taking the victim's vital signs, they were unable to examine the victim because she became agitated at the presence of strangers. Zenobia and Woods declined to have the victim transported to the hospital by EMTs, but indicated they would take her on their own.[4] Thereafter, Wilson received a telephone call from Woods, who pretended to be a hospital employee, saying there was nothing wrong with the victim. Wilson then called an adult protective services hotline to arrange for a meeting.

On February 3, 2010, Wilson arrived at Zenobia's residence and demanded to see the victim. Zenobia emerged, carrying the victim "like a rag doll." Wilson insisted that the victim be taken to the emergency room, but Woods "took completely over"

[4] There did not appear to be any record of a visit to the hospital by the victim on February 2, 2010. Woods claimed the victim was not seen aside from taking her vital signs and that she was instead referred to a primary care physician, but a nurse at the hospital testified that every patient who visited the emergency room would have been seen.

4

and did not want Wilson to take the victim. When Wilson asked who had been taking care of the victim in view of the victim's condition, Woods said that he had been taking care of her, denied that the victim was dehydrated or malnourished, and asserted that she was "fine." Woods repeatedly answered questions Wilson directed to Zenobia, and continued to do so after he left the room. Ultimately, Wilson, Zenobia's sister, and two of Wilson's friends who accompanied her were able to remove the victim from the residence and transport her to the hospital.

When the victim arrived at the hospital, nurses could not locate any medical history for the victim. Additional medical records indicated the victim had not seen a doctor since 2008. The victim presented in a "severely debilitative state," including severe dehydration and a low pulse. She was virtually non-responsive, had an enlarged liver, had bedsores, and had multiple scratches and bruises all over her body. Her body was also contracted, indicating she had been bed-bound or unable to walk for some time. An X-ray of her left wrist also revealed a self-healed spiral fracture. The emergency room doctor who examined the victim stated that she was "in trouble." Although the victim's state-issued identification card listed her weight as 98 pounds, a witness testified that her weight was 55 pounds when she arrived at the hospital.

In an interview with an adult protective services agent after the victim had been removed from Zenobia's residence, Woods stated that the victim was not emaciated and had "been that size her whole damn life"; that he did not need to feed her because "she knows what a spoon is for"; and that she sustained the injuries to her head because she fell off her bed. However, Woods also admitted to a GBI agent that he voluntarily helped to feed and bathe the victim and launder her clothing.

An Evans County grand jury indicted Woods for two counts of neglect of a disabled person and one count of abuse of a disabled person. At trial, Woods testified that he did not have any obligation to the victim; that he noticed a deformity on the victim's hand; that he noticed lesions on the victim's head; that her weight had decreased substantially; and he repeatedly stated that his mother, Zenobia Woods, who was recovering from a brain aneurysm, was solely responsible for the victim's care.[5] The jury returned a verdict of guilty against Woods on one count of neglect of a disabled person, and the trial court denied Woods' motion for new trial as amended.[6] This appeal followed.[7]

---

[5] Zenobia Woods entered pleas of guilty to three counts of neglect of a disabled person.

[6] This case presents yet another troubling example of post-trial review inexplicably delayed. We note that Woods was indicted in February 2011 and tried

1. Considering Woods' fourth enumeration first,[8] he argues that the evidence

---

in June 2012. However, a particularized motion for new trial was not filed until October 2019. In the interim, the record suggests that Woods has completed his original sentence. Although Woods raises no claim of prejudice as a result of the delay, our Supreme Court has strongly rebuked delay in the resolution of post-conviction matters. See, e.g., *Owens v. State*, 303 Ga. 254, 259-260 (4) (811 SE2d 420) (2018). As our Supreme Court explained,

> even if long-delayed appeals rarely result in outright reversals of convictions or only retrials or resentencings, these extended and unjustified delays in resolving criminal cases make our State's criminal justice system appear unfair and grossly inefficient. We must all work to prevent delays, particularly in the most serious of our criminal cases, that cannot be explained or justified to the parties in those cases, the victims of crimes, and the public we serve.

(Punctuation omitted.) *Tucker v. State*, 355 Ga. App. 796, 797, n. 4 (845 SE2d 759) (2020) (citing *Owens*, 303 Ga. at 259-260 (4)).

[7] In violation of our Rules, the State failed to timely file an appellee's brief. See Court of Appeals Rule 23 (b) ("A brief *shall* be filed by the State when it is the appellee in the appeal of a criminal case.") (emphasis supplied). Although the State ultimately filed an appellee's brief in response to an order of this Court, representatives of the State are reminded nonetheless that they "may be subject to sanctions, including contempt, for failing to file a timely responsive brief." Id.

[8] See, e.g., *Porter v. State*, 358 Ga. App. 442, 443 (1), n. 2 (855 SE2d 657) (2021) ("For convenience of discussion, we have taken the enumerated errors out of the order in which [Woods] has listed them.") (citation and punctuation omitted).

was insufficient to support his conviction. In particular, Woods argues that he lacked a legal duty to obtain medical care for the victim. We are not persuaded.

> On appeal from a criminal conviction challenged for insufficient evidence, we view the evidence in the light most favorable to support the jury's verdict, and the defendant no longer enjoys a presumption of innocence. We do not weigh the evidence or assess witness credibility, but merely determine whether the evidence was sufficient to find the defendant guilty of the charged offense beyond a reasonable doubt.

(Citations and punctuation omitted.) *Manning v. State*, 296 Ga. App. 376, 377 (674 SE2d 408) (2009). Relevant to this appeal, "the abuse, neglect, or exploitation of any disabled adult or elder person shall be unlawful." OCGA § 30-5-8 (a) (1) (2010). "Neglect" is defined as "the absence or omission of essential services to the degree that it harms or threatens with harm the physical or emotional health of a disabled adult or elder person." OCGA § 30-5-3 (10) (2010). "Essential services" includes

> social, medical, psychiatric, or legal services necessary to safeguard the disabled adult's or elder person's rights and resources and to maintain the physical and mental well-being of such person. These services shall include, but not be limited to, the provision of medical care for physical and mental health needs, assistance in personal hygiene, food, clothing, adequately heated and ventilated shelter, and protection from health and safety hazards but shall not include the taking into physical custody of a disabled adult or elder person without that person's consent.

8

OCGA § 30-5-3 (8) (2010).

In this case, the State indicted Woods for neglect of a disabled person alleging that he "did wilfully neglect [the victim] . . . by means of failing to provide her with essential services . . . to the degree that it caused harm to the physical health of [the victim]" in that Woods failed "to see that [the victim] had proper medical care for her multiple head lacerations and pressure ulcers[.]" Evidence adduced at trial, which is recited in greater detail above, revealed that Woods voluntarily offered some level of care to the victim himself, and interfered with others' efforts to seek treatment for the victim. Moreover, Woods acknowledged that he had received rudimentary medical training during his service with the United States Navy and noted a deformity on the victim's hand and injuries on her head, but did not seek treatment for the victim — purportedly deferring such decisions to his ailing mother. Taken together, we conclude that the evidence was sufficient for a rational trier of fact to find Woods guilty beyond a reasonable doubt of the crime for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979); see also *Best v. State*, 355 Ga. App. 881, 886 (1) (d) (846 SE2d 157) (2020) ("the jury was not required to believe [Woods'] testimony or to disbelieve the State's witnesses").

9

2. Next, Woods contends that OCGA § 30-5-8 (2010) is unconstitutionally vague and, therefore, violates due process "because it fails to give fair warning that specific conduct is forbidden and does not provide sufficient specificity so as to discourage arbitrary enforcement. . . ." This enumeration presents nothing for our review.

Woods raised this argument in an appeal he originally filed in the Supreme Court of Georgia. See Ga. Const. of 1983, Art. VI, Sec. VI, Par. II (1). However, the Supreme Court transferred the appeal to this Court, finding that Woods' "pre-trial challenges to the sufficiency of the indictment did not properly raise a constitutional vagueness challenge to the statute" and that "a constitutional challenge raised for the first time in a motion for new trial does not invoke [the Supreme] Court's jurisdiction[.]" "[T]he transfer of [Woods'] appeal by the Supreme Court to this Court is a final determination that no constitutional question was in fact properly raised." (Citation and punctuation omitted.) *Nahid v. State*, 276 Ga. App. 687, 687-688 (1) (624 SE2d 264) (2005); see also *Vaughn. v State*, 352 Ga. App. 32, 37 (2) (833 SE2d 723) (2019) ("[T]he Supreme Court's determination in its transfer order is final and binding.") (citation and punctuation omitted). Therefore, the Supreme Court's decision on this issue controls, and this enumeration presents nothing for our review.

10

3. Finally, Woods argues that he received ineffective assistance of trial counsel because of counsel's failure to raise a void-for-vagueness due process challenge to OCGA § 30-5-8 (2010) or to object to the trial court's sua sponte jury instruction on the definition of "caretaker" when "the statute of conviction does not use that word[.]" We do not agree.

Under Georgia law,

> to obtain reversal of a conviction based on a claim of ineffective assistance of counsel, a defendant has the burden of proving that counsel's performance was deficient, and that, but for the deficiency, there was a reasonable probability the outcome of the trial would have been different.

(Citation and punctuation omitted). *State v. Banks*, 337 Ga. App. 749, 751 (789 SE2d 619) (2016). If a defendant fails to satisfy either prong of the test for ineffective assistance of counsel, it is not incumbent upon this Court to examine the other prong. See, e.g., *Thomas v. State*, 318 Ga. App. 849, 857 (5) (734 SE2d 823) (2012).

(a) *Void for Vagueness Challenge*. Woods first asserts that he received ineffective assistance of trial counsel due to counsel's failure to pursue a due process challenge against OCGA § 30-5-8 (2010) as described in Division 2, supra. In its transfer order, however, the Supreme Court noted that "the standard for effectiveness

11

of counsel does not generally require a lawyer to anticipate changes in the law or pursue novel theories of defense." See also *Thomas v. State*, 354 Ga. App. 815, 822 (2) (a), n. 5 (841 SE2d 458) (2020); *Hughes v. State*, 266 Ga. App. 652, 655 (3) (a) (598 SE2d 43) (2004). Here, "[Woods] has not cited, and we have not found, any case [adjudicating] a similar constitutional challenge to [OCGA § 30-5-8 (2010)]."[9] *Hughes*, 266 Ga. App. at 655 (3) (a). It follows that "[t]rial counsel's failure to raise this novel legal argument does not amount to ineffective assistance of counsel." Id.

(b) *Definition of "Caretaker."* Next, Woods contends that he received ineffective assistance of trial counsel due to counsel's failure to object to the trial court's sua sponte jury instruction defining "caretaker" when that word was not part of the charging statute. We disagree.

In its ruling on Woods' motion for a directed verdict, the trial court mentioned the definition of "caretaker," noting that "it means a person that has the responsibility for the care of a disabled adult or elderly person as the result of a family relationship,

---

[9] Indeed, it appears that the only meaningful discussion of the potential vagueness of any version of OCGA § 30-5-8 came in a special concurrence, which concluded that the statute was not unconstitutionally vague as applied to that defendant. See *Marks v. State*, 280 Ga. 70, 78 (623 SE2d 504) (2005) (Carley, J., concurring); see also id. at 74-75 (4) (declining to consider vagueness argument due to lack of ruling by the trial court); *Smith v. State*, 311 Ga. App. 757, 762 (3) (717 SE2d 280) (2011) (holding that vagueness argument was moot).

contract, or voluntary assumptions." Based upon evidence that Woods stated that he helped with the victim's care, the trial court concluded that a jury question existed "as to whether or not [Woods] had assumed any responsibility." Then, during the charge conference, the trial court indicated that it would instruct the jury on definitions contained in OCGA § 30-5-3, including "abuse," "caretaker," and "disabled adult."[10] As part of its charge, the trial court instructed the jury, in language that tracked OCGA § 30-5-3 (2) (2010), that "a caretaker is a person who has the responsibility for the care of a disabled adult or elder person . . . as the result of a family relationship, contract, voluntary assumption of that responsibility, or by operation of law."[11] The transcript does not show any discussion concerning the inclusion of the definition of "caretaker," and trial counsel did not object to the instruction either during the charge conference or at the conclusion of the trial court's charge.

Georgia law provides that

---

[10] The State included the definitions of "abuse" and "disabled adult" in its requests to charge.

[11] See OCGA § 30-5-3 (2) (2010) ("'Caretaker' means a person who has the responsibility for the care of a disabled adult or elder person as a result of family relationship, contract, voluntary assumption of that responsibility, or by operation of law.").

13

[w]hen a defendant raises an ineffective assistance of counsel claim based on counsel's failure to . . . object to certain jury charges, the defendant must show that the charges in question were erroneous and that, if proper charges had been given, there is a reasonable probability that the result of the trial would have been different.

(Citation and punctuation omitted.) *Gathuru v. State*, 291 Ga. App. 178, 182 (3) (661 SE2d 233) (2008). "[W]here there is any evidence, however slight, upon a particular point, it is not error to charge the law in relation to that issue." (Citation and punctuation omitted.) *Cochran v. State*, 276 Ga. App. 840 (625 SE2d 92) (2005) (holding "trial court did not err by giving a sua sponte instruction on voluntary intoxication" in view of evidence defendant had been drinking); see also *Johnson v. State*, 185 Ga. App. 505, 506 (1) (364 SE2d 893) (1988) (approving sua sponte charge on flight).

In this case, Woods has not demonstrated error by trial counsel. Although Woods testified that he "had no obligation to [the victim]" and that he made "no verbal commitment" to care for the victim, he admitted that he transported the victim to the hospital after the decision was made that the EMTs could not transport her without upsetting her. He also stated that he "incidentally" helped his mother care for the victim. Moreover, Woods admitted to a GBI agent that he helped to feed and

14

bathe the victim and launder her clothing. Inasmuch as there was some testimony —
from Woods himself — that he had no duty or obligation to care for the victim, the
trial court properly charged the jury on the definition of "caretaker" in order to
provide the jury with context concerning Woods' alleged duty. See generally
*Cochran*, 276 Ga. App. at 840; *Johnson*, 185 Ga. App. at 506 (1). And because the
charge was proper,[12] trial counsel did not commit error when he did not object to it.
See, e.g., *Bell v. State*, 352 Ga. App. 802, 810 (2) (b) (835 SE2d 697) (2019) ("the
failure to make a meritless objection cannot support a claim of ineffective
assistance") (citation and punctuation omitted). Therefore, this enumeration fails.

In sum, we are bound by the Supreme Court's conclusion concerning Woods'
failure to preserve his void-for-vagueness due process challenge to OCGA § 30-5-8
(2010). We further conclude that Woods has failed to demonstrate ineffective
assistance of trial counsel. Finally, we conclude that the evidence was sufficient to
support Woods' conviction. Therefore, we affirm the trial court's order denying
Woods' motion for new trial as amended.

*Judgment affirmed. Miller, P. J., and Pipkin, J., concur.*

---

[12] In view of our conclusion, it is not relevant that Woods did not include an argument that the trial court committed plain error by including the charge. See OCGA § 17-8-58 (b).